### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SEAN TOLIVER, et al., | : | |
| | : | |
| Plaintiffs, | : | LEAD CONSOLIDATED |
| | : | CASE NO. |
| v. | : | |
| | : | 3:16-cv-1899-SRU |
| SCOTT SEMPLE, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

### SECOND AMENDED CONSOLIDATED COMPLAINT

### NATURE OF THE ACTION

1.      This action is brought under 42 U.S.C. § 1983, by nineteen (19) named

Plaintiffs (collectively, "Plaintiffs") in this Consolidated Action who are current and former

inmates at the Osborn Correctional Institution in Somers, Connecticut ("Osborn"), who

have been subjected to conditions of confinement in violation of their rights under the

Eighth Amendment of the Constitution of the United States.

2.      The claims herein arise out of conditions of confinement of the Plaintiffs,

on behalf of themselves and on behalf of all current and former inmates of Osborn (a)

who have been exposed to hazardous levels of polychlorinated biphenyls ("PCBs") in

four housing blocks at Osborn known as the "Q Buildings," before such buildings were

permanently closed in November 2016, (b) who have been exposed to hazardous levels

of friable asbestos in areas throughout the facility, but particularly in the Q Buildings

where each of the named Plaintiffs was involuntarily housed for extended periods of

time, and (c) who have been forced to drink and shower in water that Plaintiffs believe

to be contaminated with bacteria and high levels of chemical substances that have caused medical problems for many inmates.

3.    As set forth below, knowingly compelling inmates to be exposed to such hazardous, unsafe and unhealthy conditions of confinement – conditions about which each of the named Defendants was clearly aware for many years – reflects a deliberate indifference on the part of the corrections officers, maintenance and environmental engineers, corrections supervisors, wardens and commissioners of the Connecticut Department of Corrections to the health and well-being of the inmates, exposing each Plaintiff to an unreasonable risk of serious health problems in violation of their rights under the Constitutions of the United States and the State of Connecticut.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. §§ 1983 and 1988.  The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

5.    This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.  This Court also is authorized to grant injunctive relief under 18 U.S.C. § 3626.

6.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391, because the State of Connecticut is where the events giving rise to the claims at issue occurred.

## PARTIES

7.    Plaintiffs are all current or former inmates who were housed in the Q Buildings at Osborn, operated by the State of Connecticut, Department of Corrections, who were exposed to excessive levels of PCBs, friable asbestos and unsafe drinking

water, constituting conditions of confinement which violated their rights under the Eighth Amendment of the Constitution of the United States, and under Article I, Sections 8 and 9 of the Connecticut Constitution.

8.      Plaintiff Sean Toliver was formerly an inmate incarcerated at Osborn in the Q Buildings for 46 months, between October 18, 2011 and August 2015.  Plaintiff Toliver is currently under the care of a physician who is working to determine baselines for toxin and bacterial exposures associated with the years he was housed in the Q Buildings.

9.      Plaintiff James Babulsky was formerly an inmate incarcerated at Osborn in the Q Buildings for four years, between 2012 and 2016.  Since his release, Plaintiff Babulsky has been tested for exposure to toxins and bacteria.  The results indicate that Plaintiff Babulsky's PCB levels are double the acceptable level under standards set by the Environmental Protection Agency ("EPA").  Plaintiff Babulsky is being treated by an infectious disease specialist since he now suffers from medical issues related to his endocrine system that may be directly related to exposure to toxins while housed in the Q Buildings.

10.      Plaintiff Jeremy Louis Barney is currently an inmate incarcerated at Osborn who must drink the discolored and strong-smelling tap water, and who was housed in the Q Buildings for 58 months, between November 2011 and September 2016, at which time most inmates were removed from the Q Buildings.  Plaintiff Barney has regularly suffered from intestinal and digestive disorders since his incarceration that have gone undiagnosed and untreated.  He has not yet been tested for toxin or bacterial exposure.

\
9472877v1

11.     Plaintiff William Boo was until recently an inmate incarcerated at Osborn who had to drink the discolored and strong-smelling tap water, and who was housed in the Q Buildings for two (2) years between 2014 and 2016, when all inmates were removed from the Q Buildings.  Plaintiff Boo suffers from severe stomach pains, constipation and diarrhea that remains undiagnosed and untreated.  He also complains of eye issues and jaundicing of his skin.  He has not yet been tested for toxin or bacterial exposure.

12.     Plaintiff Kenneth Carter is currently an inmate incarcerated at Osborn who must drink the discolored and strong-smelling tap water, and who was housed in the Q Buildings for 30 months before the closure in November 2016.  Plaintiff Carter suffers from severe stomach pains, blurry vision, rashes and excessive coughing, which remain undiagnosed and untreated.  He has not yet been tested for toxin or bacterial exposure.

13.     Plaintiff Luis Claudio is currently an inmate incarcerated at Osborn who must drink the discolored and strong-smelling tap water, and who was housed in the Q Buildings for nearly eight years, between 2008 until September 2016, at which time he was relocated with other inmates who had been housed in the Q Buildings.  Plaintiff Claudio has experienced serious intestinal and digestive issues since his incarceration, including the inability to maintain his weight.  He has experienced severe and unexplained rashes.  He has not yet been tested for toxin or bacterial exposure.

14.     Plaintiff Anthony R. Johnson is currently an inmate incarcerated at Carl Robinson Correctional Institution who was previously an inmate at Osborn, housed in the Q Buildings for one (1) year between 2015 and October 2016, several weeks after other inmates had been moved from the Q Buildings before they were closed.  Plaintiff

4

Anthony R. Johnson further contends that, while housed in the Q Buildings, his unit was infested with rodents, and that he filed complaints seeking transfer to another unit or facility with no response.  Since his time in the Q Buildings, Plaintiff Anthony R. Johnson has been diagnosed with asthma.  Since he was compelled to drink and shower in the discolored and strong-smelling tap water, his skin continuously breaks out in rashes. When he notified Defendant Kevin Roy of his concerns regarding the condition of the tap water, Defendant Roy responded to Plaintiff Anthony R. Johnson that it was his problem and he "should have never come to prison."  He has not yet been tested for toxin or bacterial exposure.

15.     Plaintiff Roger Johnson is currently an inmate incarcerated at Osborn who must drink the discolored and strong-smelling tap water, and who was housed in the Q Buildings for four years, between 2012 and 2016.  Since he has been at Osborn, Plaintiff Johnson developed year-round, extreme allergies, intestinal pains, blood in his stool, regular rashes and a continual sore throat.  He has not yet been tested for toxin or bacterial exposure.

16.     Plaintiff Randal Licari is currently an inmate incarcerated at Osborn who must drink the discolored and strong-smelling tap water and who must drink the discolored and strong-smelling tap water and who was housed in the Q Buildings prior to September 2016, when most inmates were moved from the Q Buildings in anticipation of their closure.  He has not yet been tested for toxin or bacterial exposure.

17.     Plaintiff John F. Moore is currently an inmate incarcerated at Osborn who must drink the discolored and strong-smelling tap water, and who was housed in the Q Buildings for 31 months, between March 2014 and September 2016.  Plaintiff John F.

5

Moore suffers from skin problems, including abscesses and cysts.  He has not yet been tested for toxin or bacterial exposure.

18.     Plaintiff Timothy Monroe was formerly an inmate incarcerated at Osborn for a period of time in 2017, who was compelled during that time to drink the discolored and strong-smelling tap water.  Plaintiff Monroe asserts that he is in a high risk group that is more susceptible to medical issues associated with contaminated water, about which the named Defendants were aware, but failed to take steps to protect him from the harmful contaminants.  He has not yet been tested for toxin or bacterial exposure.

19.     Plaintiff Jose Pesante is currently an inmate incarcerated at Osborn who must drink the discolored and strong-smelling tap water, and who was housed in the Q Buildings for four months between October 2015 and January 2016.  Since Plaintiff Pesante has been at Osborn, he has experienced severe digestive issues that remain undiagnosed and untreated.  He has not yet been tested for toxin or bacterial exposure.

20.     Plaintiff Jose Rivera is currently an inmate incarcerated at Osborn who must drink the discolored and strong-smelling tap water, and who was housed in the Q Buildings for 35 months between August 2010 and July 2013.  He has not yet been tested for toxin or bacterial exposure.

21.     Plaintiff Marcos Rivera is currently an inmate incarcerated at Osborn who must drink the discolored and strong-smelling tap water, and who was housed in the Q Buildings in 2013 and again, in 2016, until the Q Buildings were closed.  Plaintiff Marcos Rivera continues to suffer from skin rashes, burning eyes while showering, stomach issues, coughing and headaches.  He has not yet been tested for toxin or bacterial exposure.

\
9472877v1

22.      Plaintiff Harold Rogers is currently an inmate incarcerated at Osborn who must drink the discolored and strong-smelling tap water, and who was housed in the Q Buildings for five years, between 2005 and 2007, and again between 2015 and 2016. Plaintiff Rogers has experienced regular and serious rashes on his legs, back, chest and stomach, blurry vision, headaches, persistent cough and regular, painful stomach issues since his incarceration.  He has not yet been tested for toxin or bacterial exposure.

23.      Plaintiff Osbert Teekasingh was an inmate incarcerated at Osborn who was housed in the Q Buildings between July 8, 2012 to 2014, and again between July 7, 2015 and September 2016.  He is in the process of being tested by his physician for toxin and bacterial exposure.

24.      Plaintiff Anthony C. Wade, Sr., was an inmate incarcerated at Osborn who was housed in the Q Buildings for over 80 months, between 1984 to1989, 2005 to 2006 (13 months) and 2010 to 2013 (42 months).  In November 2016, Plaintiff Wade was informed that he had spots on both of his lungs that were diagnosed as incurable lung cancer, which he believes he contracted while incarcerated at Osborn and housed in the Q Buildings.  Plaintiff Wade has been removed from Osborn and relocated to a secure hospice setting.

25.      Plaintiff Zion T. Webb is an inmate incarcerated at Osborn who must drink the discolored and strong-smelling tap water, and who was housed in the Q Buildings for one (1) year between 2015 and 2016.  He has not yet been tested for toxin or bacterial exposure.

\
9472877v1

26.     Plaintiff Tyshun Williams is an inmate incarcerated at Osborn who must drink the discolored and strong-smelling tap water, and who was housed in the Q Buildings for five (5) years, between 2010 and 2012, and against between 2015 and 2016.  Plaintiff Williams suffers from severe stomach issues, alopecia, rashes and skin abscesses, headaches and dizziness.  He has not yet been tested for toxin or bacterial exposure.

27.     Defendant Scott Semple has served as the Commissioner for Connecticut's Department of Corrections since August 2014. As Commissioner, on information and belief, Defendant Semple has supervisory responsibility over some or all personnel in the Department of Corrections, including those personnel from Osborn named as Defendants herein.  As Commissioner, Defendant Semple was responsible for administering, coordinating and controlling the operations of Department of Corrections' facilities. He was also responsible for the overall supervision and training of employees, as wells as for ensuring that inmates were treated humanely according to the dictates of the United States Constitution and the Constitution of the State of Connecticut.  As set forth below, Defendant Semple had direct knowledge of the unsafe and hazardous conditions of confinement of each of the Plaintiffs and has shown a deliberate indifference to the hazards to which Plaintiffs were/are exposed.

28.     Defendant James Dzurenda was the Deputy Commissioner and then, the Commissioner of Connecticut's Department of Corrections from August 2013 to August 2014.  As such, on information and belief, Defendant Dzurenda had supervisory responsibility over some or all personnel in the Department of Corrections during the relevant period, including those personnel from Osborn named as Defendants herein

\
9472877v1

who worked at the facility between August 2013 and August 2014.  As set forth below, on information and belief, Defendant Dzurenda had direct knowledge of the unsafe and hazardous conditions of confinement of each of the Plaintiffs and has shown a deliberate indifference to the hazards to which Plaintiffs were/are exposed.

29.     Defendant Leo Arnone was the Commissioner of Connecticut's Department of Corrections from 2010 to 2013.  As Commissioner, on information and belief, Defendant Arnone had supervisory responsibility over some or all personnel in the Department of Corrections during the relevant period, including those personnel from Osborn named as Defendants herein who worked at the facility between 2010 and 2013.  As set forth below, on information and belief, Defendant Arnone had direct knowledge of the unsafe and hazardous conditions of confinement of each of the Plaintiffs and has shown a deliberate indifference to the hazards to which Plaintiffs were/are exposed.

30.     Defendant Cheryl Cepelak is currently the Deputy Commissioner of Connecticut's Department of Corrections.  As Deputy Commissioner, on information and belief, Defendant Cepelak has or had supervisory responsibility over some or all personnel in from Osborn, including several of those Defendants named herein.  As set forth below, on information and belief, Defendant Cepelak had direct knowledge of the unsafe and hazardous conditions of confinement of each of the Plaintiffs.

31.     Defendant Carol Chapdelaine was Warden at Osborn from 2009 to 2014. As such, on information and belief, Defendant Chapdelaine had direct knowledge, as set forth below, of the unsafe and hazardous conditions of confinement of each of the

\
9472877v1

Plaintiffs and has shown a deliberate indifference to the hazards to which Plaintiffs were/are exposed.

32.    Defendant Edward Maldonado was the Warden at Osborn from 2014 to 2017.  As such, on information and belief, Defendant Maldonado had direct knowledge, as set forth below, of the unsafe and hazardous conditions of confinement of each of the Plaintiffs and has shown a deliberate indifference to the hazards to which Plaintiffs were/are exposed.  The decision to close the Q Buildings, and much of the remediation and abatement of the toxic conditions, took place while Defendant Maldonado was Warden.

33.    Defendant Steve Link was, at all relevant times, the Department of Corrections' Director of Engineering and Facilities Management Services.  According to the Department of Corrections website, Engineering and Facilities Management Services, the department for which Defendant Link is Director, is responsible for "facility preventative maintenance; and repair," and "compliance with OSHA standards and environmental guidelines."  As such, and as set forth below, on information and belief, Defendant Link had direct knowledge of the unsafe and hazardous conditions of confinement of each of the Plaintiffs and has shown a deliberate indifference to the hazards to which Plaintiffs were/are exposed.

34.    Defendant Rich Hardy was, at all relevant times, the Head of Maintenance at Osborn.  As such, on information and belief, Defendant Hardy had supervisory responsibility over those grounds and maintenance workers named as Defendants herein.  As set forth below, Defendant Hardy also had direct knowledge of the unsafe

\
9472877v1

and hazardous conditions of confinement of each of the Plaintiffs and has shown a
deliberate indifference to the hazards to which Plaintiffs were/are exposed.

35.     Defendant Kevin Roy was, at all relevant times, a District 1 Plant Facilities
Engineer II, a managerial position with the Department of Corrections, whose position
was at Osborn.  Based upon documents produced by the Department of Corrections,
and on information and belief, Defendant Roy has been principally responsible for
testing, or supervising the testing, of the drinking water during the relevant period of
time in this action.  Defendant Roy also was responsible for reporting on the water
quality to staff and inmates at Osborn during the relevant period of time, and was aware
of deficiencies in the water quality and in the qualifications of staff responsible for
monitoring.  On information and belief, however, Defendant Roy was not always a
certified operator with credentials to test the drinking water.  For example, in calendar
year 2013 (reported in July 2014), the Department of Corrections was cited for a
deficiency at Osborn, presumably based upon Defendant Roy's lack of appropriate level
certification as a water plant operator.  The 2013 report posted by Defendant Roy
references a second deficiency, which appears to have related to the elevated level of
the microbiological contaminant, coliform, in the drinking water.  On information and
belief, Defendant Roy, during the period at issue, continued to sign off on monitoring,
testing and reporting on behalf of the Department of Corrections to the Department of
Public Health.  Defendant Roy has been cited several times for failing to file water
testing reports in a timely manner. Plaintiffs were never informed when there were such
violations.   Finally, Defendant Roy knew and has known that the drinking water at
Osborn was/is unsafe and dangerous for consumption and bathing by Plaintiffs and

\
9472877v1

other inmates, but he took no action to correct the condition of the water, warn Plaintiffs

of the danger in drinking the water and/or provide substituted, bottled drinking water.  As

set forth below, as a result of his direct involvement in the maintenance of water

systems at Osborn, Defendant Roy had direct knowledge of the unsafe and hazardous

conditions of confinement of each of the Plaintiffs and has shown a deliberate

indifference to the hazards to which Plaintiffs were/are exposed.

36.    Defendant Timothy Carey was, at all relevant times, an Environmental

Analyst III for the Facilities Management and Engineering Department of the

Department of Corrections who worked at Osborn.  Based upon documents produced

by the Department of Corrections, Defendant Carey was identified as a staff member

who collected and submitting water samples at Osborn for testing during the relevant

time period. As set forth below, Defendant Carey had direct knowledge of the unsafe

and hazardous conditions of confinement of each of the Plaintiffs and has shown a

deliberate indifference to the hazards to which Plaintiffs were/are exposed.

37.    Defendants Ronald Trap, Robert Gero, Jr., and David Bell, on information

and belief, were at all relevant times, Grounds and Maintenance Officers for the

Department of Corrections who worked and/or continue to work at Osborn.  As set forth

below, Defendants Trap, Gero, and Bell had direct knowledge of the unsafe and

hazardous conditions of confinement of each of the Plaintiffs and have shown a

deliberate indifference to the hazards to which Plaintiffs were/are exposed.

38.    Defendants Walter Sullivan, Miguel Acosta, Roger DeNino and Robert

Jordan, on information and belief, were at all relevant times Corrections Officers at

Osborn.  As set forth below, Defendants Sullivan, Acosta, DeNino and Jordan had direct

knowledge of the unsafe and hazardous conditions of confinement of each of the Plaintiffs and have shown a deliberate indifference to the hazards to which Plaintiffs were/are exposed.

39.     All Defendants are being sued in their individual and official capacities with money damages sought against each of them in their individual capacities only.

## FACTS REGARDING CONDITIONS OF CONFINEMENT

### A.     PCB Exposure

40.     The most troubling toxic exposure suffered by many inmates at Osborn, including all but one of the named Plaintiffs, has been to PCBs in the Q Buildings at Osborn.  As set forth above, at least one former inmate, Plaintiff Babulsky, has tested positive for PCB poisoning and is now facing a lifetime of medical monitoring and stress as he waits to learn whether such exposure will lead to life-threatening illnesses.

41.     In 1979, the EPA completely banned the manufacture of PCBs and phased out most PCB uses in the United States.  Since PCBs are not water-soluble, they are not excreted from the body and accumulate over a person's lifetime, increasing that person's body burden of PCBs.   PCBs are widely recognized, including by EPA, as probable human carcinogens directly linked to a higher incidence of liver, biliary, stomach, intestinal and thyroid cancers and non-Hodgkin's lymphoma, as well as to increased levels of some liver enzymes, with possible hepatic damage, chloracne and related dermal lesions, and respiratory problems.

42.     Documents have been produced in this action, in response to a subpoena *duces tecum* served by the Plaintiffs on TRC Environmental Corp. ("TRC"), an outside vendor which was under contract with the Department of Corrections to test for and, if

necessary, to remediate various toxic substances and materials in anticipation of facility renovations at Osborn.  According to those documents, in late-2011, TRC was hired by the Department of Corrections to conduct testing for PCBs in and around the Q Buildings.  The results of the initial testing of window caulking in the Q Buildings, as reflected in documents produced to Plaintiffs by TRC, show significantly elevated PCB levels in and around the Q Buildings, which were utilized as housing cell blocks for inmates.

43.     TRC submitted a letter, dated December 19, 2011, to Rebecca A. Cutler, Environmental Analyst with the Connecticut Department of Construction Services, regarding the testing that TRC completed in November 2011, which states as follows:

> At your request, on November 14, 2011 TRC performed a PCB exterior caulk/glazing investigation in connection with the planned renovation of the Osborn Correctional Institution (OCI) Q-Block located in Somers, Connecticut.   TRC's methodology included conducting a visual site inspection to identify and locate homogeneous caulk/glazings, along with the collection of analyses of representative caulk/glaze samples of PCB content.… Thirty-four (34) samples in all were collected from twelve (12) distinct homogeneous materials identified.   Analysis revealed two (2) material types that contain more than 50 parts per million (underline: greater than 50 ppm) total PCB, six (6) to contain more than one but less than 50 ppm total PCB and four (4) to contain less than one ppm total PCB.   Thus, several of the identified homogeneous caulk/glazes are either defined as PCB product waste (equal to or greater than 50 ppm) under the EPA TSCA standard (40 CFR 761) or are regulated by CTDEEP (greater than 1 less than 50 parts per million) under the State PCB statutes (22a-463-469).   *Based on this data further investigation for potential PCB impacts to adjoining porous substrates (brick, CMU, wood, etc.) and/or soil/surface cover is warranted, along with the development of PCB remedial plans to facilitate the renovation project* (emphasis added).

44.     According to TRC documents, additional testing in and around the Q Buildings was completed by June 2012, the results of which confirmed the presence of significantly elevated levels of PCBs in and around windows that were caulked with the

\
9472877v1

PCB-containing materials.  Specifically, the windows in Q Building housing blocks and

in the kitchen tested positive for elevated levels of PCBs.  The soil and asphalt surfaces

outside of these windows also tested positive for elevated levels of PCBs.  Based upon

the documents produced by TRC, PCB testing was not conducted in any other area of

the Osborn facility other than the Q Buildings.

45.     On December 7, 2012, over a year after TRC first provided the results of

PCB testing around the Q Buildings, Defendant Carey wrote a letter to Commissioner

Daniel C. Esty of the Connecticut's Department of Energy and Environmental Protection

("DEEP"), regarding the findings in the TRC test results.  Mr. Carey wrote that,

> in November 2011, TRC (located at 21 Griffin Road in North Windsor, Connecticut 06095) was retained at the Osborn Correctional Institution (335 Bilton Road in Somers, Connecticut 06071) for the investigation of PCBs (polychlorinated biphenyls) in exterior and interior caulk/glazing.... In terms of caulk sampling, thirty-four samples were taken and revealed twelve different types of caulk.  For the substrata and exterior caulk sampling, 129 samples were taken in total and of which 113 samples were taken from surfaces on the ground below and sixteen from surfaces the caulk was adhered to.

Defendant Carey's letter, which was copied to Defendants Arnone, Cepelak, Dzurenda,

Chapdelaine, Link and Roy, included the 2011 TRC letter to Rebecca Cutler, along with

the testing results setting forth the degree to which PCBs had been discovered in the Q

Buildings.

46.     TRC documents demonstrate that, despite discovering the significantly

elevated levels of PCBs in and around the Q Buildings in 2011 and 2012, the first steps

toward remediation did not begin until three years later in 2015.  In fact, in response to a

May 2016 Notice of Violation issued by the DEEP regarding PCB contamination at

Osborn, TRC stated:  "[l]ast fall of 2015 the first steps towards the cleaning of this area

\
9472877v1

was performed as just enough funding was provided to remove the old kitchen windows that contained the source window glaze."  Although the first affected windows were removed in 2015, the soil and surfaces outside and around the cell block and kitchen windows did not get remediated until mid-2016, after additional funding came through from the Department of Corrections.

47.     On or about October 20, 2016, a group of workers dressed in bright yellow demolition crew t-shirts and fully hooded white suits arrived at the area near Q Building 1 (Northside).  They took soil samples at different distances from the building.  On October 28, 2016, two workers came to Osborn to take more ground samples around the Q Buildings.  Several inmates witnessed the taking of soil samples.  The results of those samples were never provided to current or former inmates housed in the Q Buildings.

48.     Plaintiffs have since learned that Defendant Semple had written a memorandum in early 2016 that, instead of renovating, he would rather close the Q Buildings due to the infrastructure and contamination problems.  Nevertheless, even though Defendant Semple – who was ultimately responsible for all facilities and inmates of the Department of Corrections – knew of and acknowledged the unsafe conditions in the Q Buildings, inmates remained housed in the Q Buildings for years.

49.     In December 2016, Connecticut's Governor Dannel P. Malloy appeared on television from Osborn and attributed the closing of the Q Buildings to a decrease in the State's crime rate and prison population overall.  However, when questioned by reporters, Governor Malloy conceded that the presence of elevated levels of PCBs and

\
9472877v1

other environmental factors, including asbestos, could have been part of the decision to close the Q Buildings.

50.     Also in December 2016, in response to the closing of the Q Buildings, Collin Provost, President of AFSCME Local 391, which union represents corrections officers, was quoted in the press as stating:  "For years, our union raised concerns about air quality, contamination, and the structurally unsound conditions within the particular housing units that have been shut down…The Qs had a limited life expectancy and closing these units was necessary from a health and safety standpoint for staff and inmates."[1]

51.     In this case, for as long as five years after receiving documented evidence of the significantly hazardous levels of PCBs in the Q Building cell blocks and kitchen, the Department of Corrections and the named Defendants intentionally chose to place the inmates at risk of exposure to and poisoning by the hazardous and deadly toxin.  As Governor Malloy stated, the Department of Corrections had numerous prisons with empty cells, yet the decision was made to continue housing inmates in the Q Buildings for years.

52.     Inmates who resided in the Q Buildings were never notified or warned of the hazardous and toxic condition of the Q Buildings, and no medical testing or screening has ever been offered or provided to those inmates who were forced to reside in the Q Buildings while they were open.

---

[1] *See* "State to Close Sections of Somers Prison," *Hartford Courant*, December 8, 2016, available at http://www.courant.com/politics/hc-malloy-closing-prison-units-20161207-story.html.

\
9472877v1

**B.**   **Friable Asbestos Exposure**

53.     In addition to the PCB exposure, Plaintiffs were regularly exposed to friable asbestos throughout the facilities at Osborn, which the State of Connecticut has been abating and removing from Osborn over the course of several years between 2013 and 2016.  Although documents reflect that asbestos abatement was completed at Osborn by November 2016, the documents further reflect that the areas in which the inmates resided and traveled most frequently, and where friable asbestos was specifically identified in 2012, were the last areas to be remediated at Osborn.

54.     Indeed, Plaintiffs observed fine, thread-like strands stuck to the glazing and caulking around windows in Osborn.  During certain times of the day, when the sunlight was just right, such strands could be seen floating in the air throughout the inmate quarters and in hallways traveled by inmates.  Plaintiffs observed that such strands were particularly visible in areas where exposed pipes were wrapped with some sort of substance that had torn over time or had developed holes and cracks as a result of leaks in the pipes, consistent with descriptions in environmental testing reports of asbestos-containing pipe insulation and related "debris."

55.     Friable asbestos is universally recognized as a human carcinogen directly linked to a higher incidence of life-threatening lung cancer in those who have been exposed over a period of time.  The EPA banned the manufacture and use of most asbestos products in the 1970s, and the incidence of cancer and related medical conditions caused by exposure to friable asbestos has been well documented since the 1930s.  Although some inmates have already manifested symptoms from toxin

exposure, causally related medical conditions may take many years to fully manifest in the inmate population exposed to the conditions.

56.     In addition to testing for PCBs at Osborn, TRC, the environmental testing and remediation company hired by the Department of Corrections, has produced documents relating to its testing and abatement of asbestos-containing building materials ("ACBMs") banned in public facilities by the EPA and/or by the Connecticut DEEP.  According to these documents, in 2012, TRC conducted an inspection of Osborn, pursuant to federal Asbestos Hazard Emergency Response Act ("AHERA") regulations, to determine the presence and condition of ACBMs.  According to a TRC report regarding the testing, TRC "identified friable and non-friable forms of ACBM" during its December 2012 inspection of the facility.

57.     Non-friable asbestos was identified by TRC in floor tiles and mastic adhesive throughout the A and L buildings, as well as in the chapel, hospital, tool crib and shop, school rooms, offices and spaces utilized by corrections staff, and in the entrance and visitor areas of the facility.  Non-friable asbestos also was identified in the exterior window glaze utilized in windows throughout the facility, as well as in ceramic tile glue in the showers of the Q Buildings.

58.     Friable asbestos, the more toxic and dangerous form of asbestos, was confirmed to exist throughout the facility in the form of fiberglass pipe insulation around pipes at the ceiling level, mudded fittings on bathing and heating water lines, and in mudded fittings on fiberglass pipe insulation specifically on shower and sink pipes and on the heat pipes in the Q Buildings.  TRC stated in its report that these latter fittings in the Q Buildings "are in bad condition and have fallen off of pipes in the chases."

59.     According to the TRC report, asbestos abatement and remediation began in late 2013, but the focus was principally on the removal of ACBM floor tiles and mastic adhesives in areas utilized by corrections staff and visitors, ACBMs that TRC had determined contained non-friable asbestos and which were otherwise in good condition.  Floor tiles and mastic adhesive were also replaced in the facility's hospital and in several classrooms.  In 2013, some pipe insulation in classrooms and in the staff weight room also was remediated to eliminate both friable and non-friable asbestos.

60.     In 2014, more floor tiles and mastic adhesive containing non-friable asbestos were removed in the P-Building maintenance shop and tool crib, in G-Block corrections offices and in the chapel.  No other abatement, particularly of known friable asbestos, was done in 2014.

61.     In 2015, more floor tiles and mastic adhesive containing non-friable asbestos were removed in the warehouse and shipping/receiving area, and in the A and O Buildings.  Windows with non-friable ACBM glazing also were replaced throughout the facility in 2015 and 2016.  No other abatement, particularly of known friable asbestos, was done in 2015.

62.     In 2016, more floor tiles and mastic adhesive containing non-friable asbestos were removed from A and O Building floors in the deputy warden's office, the phone and intel rooms, the chapel, the visitor's entrance to the facility, and in the corridor to the Q Buildings.  Windows were also replaced.  No other abatement, particularly of known friable asbestos, was done in 2016.

63.     Conspicuously missing from the abatement plans implemented at Osborn after the 2012 comprehensive inspection by TRC are plans to remove both friable and

\
9472877v1

non-friable asbestos from the Q Buildings, including the significant amount of fiberglass pipe insulation and fittings, which was identified in 2012 as containing friable asbestos and in very bad condition.  It appears that, despite the fact that the most seriously hazardous ACBMs identified at Osborn in 2012 were in the Q Buildings, nothing at all was done to remediate the friable asbestos to which inmates were being exposed.

64.     Despite the clear documentary evidence of the existence of friable asbestos in the Q Buildings, inmates were continuously housed in those buildings for years afterward, through November 2016, when most of the inmates from the Q Buildings were finally relocated and the buildings were permanently closed.

65.     Inmates who resided in the Q Buildings were never notified or warned of the hazardous and toxic condition of the Q Buildings, and no medical testing or screening has ever been offered or provided to those inmates who were forced to reside in the Q Buildings while they were open.

**C.     Contaminated and/or Fouled Drinking Water**

66.     Plaintiffs also assert claims based upon the unsafe and hazardous condition of the drinking water given to inmates every day.  The water, which inmates must drink, cook and shower with, has been described as brown, cloudy or opaque, with a strong, acrid and offensive odor and taste.  The drinking water is so disgusting that staff members at the prison do not drink it or cook with it; instead, they bring their own bottled water to Osborn.  In fact, even therapy dogs brought to the facility to work with the inmates are provided with bottled water rather than the tap water given to inmates. In addition, the water in the showers is equally brown or discolored with a putrid odor.

\
9472877v1

67.     The obligation to provide safe drinking water to inmates is fundamental, and while perfectly clear drinking water may not always be the norm, once inmates began to contract medical problems generally associated with unsafe water, including H. pylori infection and unexplained skin rashes, the conditions cross from unpleasant to a violation of constitutional rights.

68.     Since the filing of the Amended Consolidated Complaint in January 2018, at least ten (10) inmates have come forward with evidence of having been diagnosed, while at Osborn, with infection with helicobacter pylori ("H. pylori") bacteria, which is a waterborne bacteria most frequently caused by unsanitary conditions such as when raw sewage and fecal matter enters the water supply, and is most often found in under-developed nations.  H. pylori bacteria are known to invade the stomach lining and small intestine, and have been directly linked to a higher incidence of peptic ulcers, gastric hyperplastic polyps, gastric adenoma, gastric (stomach) cancer, and gastric mucosa associated-lymphoid tissue lymphoma.

69.     Several of the named Plaintiffs, along with many other inmates, have reported chronic digestive issues, including nausea, diarrhea, weight loss and constant stomach cramps and pain, most of which have gone undiagnosed and untreated by staff at Osborn acting indifferently to the conditions suffered by inmates.

70.     The source of the H. pylori bacteria, and the likely cause of other digestive problems suffered by the inmate population at Osborn, is believed to be the drinking water.

71.     The potentially hazardous condition of the drinking water at Osborn has been well-known since the 1990s, when unsafe levels of tetrachloroethylene (PCEs)

were first discovered in two of the facility's four underground wells which provided

drinking water to the facility and inmates.  At the time, the cause of the PCE

contamination was traced to a dry cleaning operation that had previously existed at

Osborn, which contaminated not only the wells at the prison, but also of the neighboring

residential area of Somers, Connecticut called Rye Hills.  The contamination was

purportedly remediated after the area was declared a state Superfund site in 1993.  At

the time, the residents of Rye Hills were connected to the municipal water supply, but

Osborn was not.

72.     The condition of the water after remediation was the subject of another

lawsuit by inmates filed in 2008, entitled *Johnson v. Rell,* No. HHD-CV-08-5016589-S,

in which the plaintiffs alleged that "the water that inmates must drink, and that is used to

cook their food has an 'off' taste and a putrid odor."  The *Johnson* case was ultimately

dismissed on technical, jurisdictional grounds, but the complaints regarding the

condition of the water were clearly made public and well-known to corrections staff at

Osborn.

73.     Osborn continues to draw water from three other wells on the site.

Although water testing is conducted on a regular basis at Osborn, documents produced

by the Department of Corrections do not indicate whether the water is tested specifically

for H. pylori bacteria; the water appears to be tested only for coliform and E. coli

bacteria, even though many Osborn inmates have been diagnosed with H. pylori

bacterial infections.

74.     Inmates at Osborn have reported that, for many years, several of the

named Defendants have illegally drilled holes in sewage and waste lines exiting the

\
9472877v1

housing units at Osborn in order to make it easier for maintenance crews to snake a

waste line that becomes clogged.  In addition to allowing the release of noxious fumes

that filled the housing units, those holes are believed to have allowed black sludge, raw

sewage and fecal matter to escape the waste lines and seep into underground aquifers

that provide domestic drinking and bathing water at Osborn.  On information and belief,

such seeping sewage is the cause of the discoloration and putrid smell and taste of the

water, and the source of inmate infection with H. pylori bacteria.

75.     Documents produced by the Department of Corrections also reflect that, in

regular testing, the well water has unusually elevated levels of arsenic, which levels

have generally have hovered just shy of maximum reportable EPA limits of 10/ppb.

Test results show that, from 2013 through 2017, arsenic levels in the water at Osborn

have remained between 8.0 and 9.8 ppb.  In fact, in each Annual Water Quality Report

produced for Osborn between 2013 through 2017, the presence of arsenic is specifically

noted by essentially the same legend as this one from the 2013 report:

> While your drinking water meets EPA's standard for arsenic, it does
> contain low levels of arsenic.  EPA's standard balances the current
> understanding of arsenic's possible health effects against the costs of
> removing arsenic from drinking water.  EPA continues to research the
> health effects of low levels of arsenic which is a mineral known to cause
> cancer in humans at high concentrations and is linked to other health
> effects such as skin damage and circulatory problems.

76.     Test results produced by the Department of Corrections also regularly

reflect that the water at Osborn that is consumed and used for showering by inmates

contains noted elevated levels of chemicals associated with disinfection through the use

of chlorine, bromine, or bromine compounds.  Each monthly test since 2013 reflects the

elevated presence of one or more of the following chemicals:  bromodichloromethane,

\
9472877v1

bromoform, chloroform and dibromochloromethane.  Although these chemicals are likely byproducts of chlorination of the Osborn wells intended to kill bacteria, and as of now, are not known to be carcinogens, tests regarding long-term exposure to these chemicals have shown a higher incidence, among other things, of certain skin disorders.

77.    Several of the named Plaintiffs, along with many other inmates, have reported chronic skin conditions, including lesions and rashes, most of which have gone undiagnosed and untreated by staff at Osborn acting indifferently to the conditions suffered by inmates.

78.    As set forth above and herein, the named Defendants, acting under the color of state law, knowingly caused the Plaintiffs to be deprived of their constitutional rights based upon the unacceptable and hazardous conditions of their confinement, particularly the conditions in the Q Buildings.  As a result, Plaintiffs seek declaratory and injunctive relief in order to redress the deprivation of their constitutional and civil rights as guaranteed and secured by the Eighth Amendment of the United States Constitution, and by Article I, Sections 8 and 9 of the Connecticut Constitution.  Plaintiffs further seek compensatory damages as to each of the Defendants, in their individual capacities, on the grounds that each Defendant was and/or remains deliberately indifferent to the harm that such exposure could or has caused to the Plaintiffs and to other inmates of Osborn.

**D.    Exhaustion of Administrative Remedies**

79.    As documented in each separate Complaint previously filed before the cases were consolidated, each of the named Plaintiffs took steps, while incarcerated or otherwise, to exhaust the administrative remedies available to him, including filing complaints with the respective wardens regarding their conditions of confinement.

\
9472877v1

## CLASS ACTION ALLEGATIONS

80.    Plaintiffs bring this action on behalf of themselves and of all others

similarly situated for the purpose of asserting, on a common basis, the claims alleged in

this Second Amended Consolidated Complaint.  Plaintiffs propose pursuing the claims

on behalf of separate, but overlapping subclasses of current and former Osborn inmates

exposed for a period of time to hazardous toxins and conditions of confinement in

violation of their constitutional rights.

### A.    Proposed Q Building Subclass

81.    Plaintiffs seek to represent a class of all current and former inmates of

Osborn who, without any choice, were housed in the Q Buildings from November 19,

2013 through November 30, 2016, and who were exposed to friable asbestos and

PCBs.[2]  As reflected in a substantial body of case law, regular and sustained exposure

to friable asbestos, a known human carcinogen, poses a significant and serious risk to

health in humans, with many long-term illnesses, including cancer, not manifesting until

years after such exposure.  Despite the fact that some or all of the named Defendants

had actual knowledge of the existence of friable asbestos in the Q Buildings, this

Subclass of inmates were kept in the Q Buildings for lengthy periods of time between

November 19, 2013 and November 2016, when the Q Buildings were permanently

closed, where they were continuously exposed to this known carcinogen.  Compelling

---

[2] Because the first complaint in these consolidated actions was filed on November 18, 2016, and in consideration of applicable statutes of limitations, Plaintiffs propose a class of current and former inmates incarcerated at Osborn from November 19, 2013 to the present, as set forth below, as to the condition of the water, and from November 19, 2013 through November 2016 for the Subclass of inmates housed in the Q Buildings, since the Q Buildings were closed at that time.

\
9472877v1

inmates to remain in housing units where friable asbestos was known to exist, and which was not remediated for several years after its discovery, constitutes a violation of the inmates' constitutional rights.

82.     In addition, as reflected in a substantial body of case law, regular and sustained exposure to PCBs, a group of man-made organic chemicals that are known human carcinogens (banned in the United States from production in 1979), poses a significant and serious risk to health, with many long-term illnesses, including cancer, not manifesting until years after such exposure.  During testing in 2011 and 2012, excessive levels of PCBs were discovered in window glazing and plumbing caulking throughout the Q Buildings, which seeped into soil and asphalt outside of the Q Buildings.  Nevertheless, despite the fact that some or all of the named Defendants had actual knowledge of the existence of PCBs in the Q Buildings, this class of inmates remained housed in the Q Buildings until late-2016 where they were continuously exposed to a known carcinogen.  Compelling inmates to remain in housing units where PCBs were known to exist, a condition that was not remediated for several years after discovery, constitutes a violation of the inmates' constitutional rights.[3]

83.     The first proposed Subclass ("Asbestos/PCB Subclass") would consist only of those current and former inmates of Osborn who, after November 19, 2013, were forced to reside in the Q Buildings even though some or all of the named

---

[3] Absent environmental testing of the remaining facilities at Osborn, it is possible that other areas of the prison also contain PCB contaminated materials, and exposure by inmates may be continuing.  Although for purposes of this Second Amended Consolidated Complaint, the Plaintiffs have limited the class to those current and former inmates who were housed in the Q Buildings, Plaintiffs reserve the right to expand the class to include inmates housed in other blocks at Osborn in the event that PCBs are discovered elsewhere in the facility.

\
9472877v1

Defendants knew of the presence of both friable asbestos and PCBs, and knew of the serious risk of exposure to both toxins on inmates.

84.     Plaintiffs, on behalf of the Asbestos/PCB Subclass, seek declaratory and injunctive relief, including (a) immediate baseline testing for all class members to determine the impact of exposure to friable asbestos and/or PCBs; (b) the provision of periodic medical monitoring for a period of years to be determined at trial based upon the known, long-term risk of developing latent illnesses as a result of exposure to friable asbestos and/or PCBs; and (c) the provision of medical treatment for any Subclass member suffering from, or who develops, symptoms or conditions associated with such exposure.

85.     Plaintiffs, on behalf of the Asbestos/PCB Subclass, also seek an award of monetary damages against the named Defendants who knowingly and intentionally, or with blatant disregard for known risks, compelled inmates to remain confined in the Q Buildings after the discovery of the presence of highly elevated levels of friable asbestos and PCBs, in violation of their constitutional rights.

**B.      Proposed Contaminated Water Subclass**

86.     Plaintiffs also seek to represent a class of all current and former inmates of Osborn who have been forced to drink and shower in tap water that has been described as brown and opaque with an offensive odor and taste, possibly caused by the seeping of raw sewage and fecal matter into the water supply as a direct result of the conduct of some of the named Defendants, resulting in significant digestive and intestinal ailments of said current and former inmates, including infection by H. pylori bacteria, as well as skin rashes and conditions, which may be caused by other chemical

contaminants in the well water of which some or all of the named Defendants have been aware for many years.

87.     The second proposed Subclass ("Water Subclass") would consist of all current and former inmates of Osborn, whether or not housed in the Q Buildings, from November 19, 2013 through the present, because all such inmates have been forced to drink and shower in what Plaintiffs believe to be contaminated tap water.

88.     Plaintiffs, on behalf of the Water Subclass, seek declaratory and injunctive relief, including (a) immediate access to bottled drinking water for all inmates; (b) immediate identification and implementation of remedial measures at Osborn to correct the condition of the tap water utilized by inmates for drinking and showering, including the elimination of H. pylori and other bacteria which may be the cause of digestive issues suffered by inmates, and the elimination of excessive chlorine-related chemicals and arsenic that is known to be in the water and which may be the cause of skin-related conditions after lengthy exposure; (c) immediate medical testing of Subclass members to determine all potential risks associated with drinking and showering in the contaminated water at Osborn, including testing of those inmates complaining of digestive issues for possible infection by H. pylori bacteria; and (d) the provision of ongoing medical treatment for any Subclass member suffering from or who develops symptoms or conditions associated with such exposure.

89.     Plaintiffs, on behalf of the Water Subclass, also seek an award of monetary damage against the named Defendants who knowingly and intentionally, or with blatant disregard for known risks, engaged in conduct leading to the contamination of drinking and bathing water utilized by inmates at Osborn, or who knew of the

\
9472877v1

presence of certain contaminates in the water, and who nevertheless forced inmates at

Osborn to drink and shower in the contaminated water, in violation of their constitutional

rights.

90.     Both the Water Subclass and the Asbestos/PCB Subclass seek such relief

based upon allegations of substantial wrongful conduct by the state, and by its officers

named as Defendants herein in their official and individual capacities (a) who promoted

an illegal and unconstitutional purpose in excess of the officers' statutory authority, (b)

who violated the constitutional rights of the subject Class members with respect to

conditions of confinement that exposed prisoners to high levels of known carcinogens

and to bacteria-filled water, with reckless and intentional indifference to the known risks

of such exposure, and (c) who, in the case of the Q Buildings, failed to affirmatively take

steps to remove the Subclass members from the unsafe conditions once the toxins

were discovered.

91.     A class action is a superior means, and the only practicable means, by

which Plaintiffs and yet-to-be-determined Class members can challenge that their

exposure to PCBs, friable asbestos, and unsafe drinking water, subjected them to

conditions of confinement in violation of their rights under the Constitutions of the United

States and the State of Connecticut.  As set forth more fully below, this action is

brought, and may properly be maintained, as a Class Action pursuant to Rule 23(a)(1)-

(4), Rule 23(b) of the Federal Rules of Civil Procedure.  This Action satisfies the

numerosity, commonality, typicality and adequacy requirements of those provisions.

\
9472877v1

**C.**   **Allegations regarding Numerosity:  Fed. R. Civ. P. 23(a)(1)**

92.    The proposed Subclasses are so numerous that joinder of the members' claims is impractical.  The current stated capacity for Osborn is 1,900 inmates, although publicly-available data and statistics indicate that, since the closing of the Q Buildings, the population has consisted of approximately 1,400 inmates, although these figures increase and decrease regularly.  Between 2010 and 2016, when the Q Buildings were closed, Osborn housed in excess of 1,900 inmates.  The Q Buildings, where the PCB and asbestos exposure took place, housed up to 400 inmates at a time.

93.     With respect to the Class members who were specifically housed in the Q Buildings, between November 2011, when the PCBs were first discovered, and the closing of the Q Buildings on September 7, 2016, potentially thousands of inmates were housed and exposed to unsafe levels of PCBs and asbestos.

94.    With respect to the Class members who were forced to drink the tap water that has been described as unsanitary and the cause of significant digestive problems, this problem impacts the entire prison population at Osborn.  The Class, from the first prisoners' rights lawsuit in 2008 to raise the issue of the drinking water until the present, will be in the thousands.

**D.**   **Allegations regarding Commonality:  Fed. R. Civ. P. 23(a)(2)**

95.    The questions of law and fact, and the relief sought, are common enough as to all members of the proposed Subclasses that a class action is particularly appropriate.  Although each member of the proposed Subclasses may not suffer from the exact same medical problems as other members of the Subclasses, the conditions of confinement will be virtually identical as to each Subclass member such that

\
9472877v1

determination of the truth or falsity of key issues of fact will resolve issues that are central to the validity of each one of the claims in one stroke.

96.     As set forth herein, those inmates in the Asbestos/PCF Subclass who were housed in the Q Buildings during the relevant period of time will have the same, or nearly the same, matters of proof relating to the nature and degree of toxin exposure as a condition of their confinement, and the degree of knowledge and culpability of the named Defendants in allowing such confinement to continue.  Further, those inmates in the Asbestos/PCB Subclass will have to meet the same legal standards in determining whether such conduct violates the class members' Eighth Amendment rights under the United States Constitution, and under Article I, Sections 8 and 9 of the Connecticut Constitution.

97.     The larger Water Subclass consists of inmates seeking relief with respect to the same unsafe drinking water consumed and used for bathing by all Osborn inmates.  Members of this Subclass likewise will have the same matters of proof as to the medical issues arising out of consumption of or exposure to unsafe water as a condition of confinement which violates their Eighth Amendment rights under the United States Constitution, and under Article I, Sections 8 and 9 of the Connecticut Constitution.

E.     **Allegations regarding Typicality:  Fed. R. Civ. P. 23(a)(3)**

98.     Plaintiffs are adequate class representatives since their claims are typical of the claims that may be asserted by each member of the proposed Subclasses arising out of the same facts and circumstances.  For example, some of the named Plaintiffs who were housed in the Q Buildings have tested positive for PCB toxin exposure, while

\
9472877v1

others, like many other class members, remain untested at this time.  Further, several of the named Plaintiffs have developed medical conditions believed to be associated with water that is unsafe for drinking and bathing.

99.     In all, the representative parties' interests coincide with, and are not antagonistic to, those members of the proposed Subclasses.  There are no known conflicts of interest among proposed Subclass members, all of whom have a similar interest in vindicating their constitutionally protected rights.

100.    Plaintiffs also will serve as adequate representatives of the proposed Subclasses in that they are represented by competent and skilled legal counsel whose interests are fully aligned with the interests of the proposed Subclasses.

**F.      Allegations regarding Adequacy:  Fed. R. Civ. P. 23(a)(4)**

101.    Plaintiffs are adequate representatives of the proposed Subclasses because, as set forth above, several of the named Plaintiffs have already tested positive for toxin exposure, and others have manifested medical conditions believed to have been caused either by toxin exposure or by drinking and/or bathing in contaminated water.  As such, the interests of the Plaintiffs coincide with, and are not antagonistic to, those of the proposed Subclass members.  There are no known conflicts of interest among class members, all of whom have a similar interest in vindicating their constitutionally protected rights.

102.    Plaintiffs also will serve as adequate representatives of the proposed Subclasses in that they are represented by competent and skilled counsel whose interests are fully aligned with the interests of the proposed Subclasses.

\
9472877v1

**G.**    **Allegations as to Fed. R. Civ. P. 23(b)(1)**

103.    Class certification is appropriate in this action to avoid inconsistent and varying adjudications with respect to individual members of the proposed Subclasses.

104.    Already, 19 separate current and former inmates of Osborn have filed separate complaints in federal court that have been consolidated into this action.  Each of those cases was previously assigned a separate docket number and was assigned to a different judge.  Given the commonality of factual and legal issues between the cases, as well as the common relief sought, these cases were already consolidated in order to allow for common resolution of virtually identical factual and legal issues put forth by each of the consolidated plaintiffs.

105.    Particularly given the lack of funds and resources available to each of the proposed Subclass members, allowing the claims to be pursued collectively as a class action will prevent undue prejudice to some class members.  Class certification also will be more economically efficient for both the judicial system and each of the proposed class members.

**H.**    **Allegations as to Fed. R. Civ. P. 23(b)(2)**

106.    Class action status is appropriate in this case given the named Defendants' deliberate indifference to conditions of confinement of the inmates at Osborn, imposing an unreasonable risk of serious medical harm to inmates housed in Osborn generally, and in the Q Buildings in particular.  Given that such exposure was entirely preventable, the continued exposure of inmates to these unsafe conditions is "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such risk."  *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

\
9472877v1

107.   Plaintiffs seek, on behalf of themselves and all others similarly situated, declaratory and injunctive relief against the named Defendants to remedy the conditions of confinement at Osborn and to provide appropriate medical monitoring and care to the members of the proposed Subclasses.  As such, class certification is appropriate under Rule 23(b)(2).

## I.   Allegations as to Fed. R. Civ. P. 23(b)(3)

108.   Class treatment under Rule 23(b)(3) is also appropriate because the common questions of law and fact overwhelmingly predominate the claims asserted by class members, and that can be asserted by future claimants who are or were confined at Osborn and subject to the conditions set forth herein.

109.   The common questions of law and fact are dispositive questions in the case of every member of each proposed Subclass.  The question of liability can therefore be determined on a class-wide basis.  Class-wide treatment of liability is a far superior method than individual suits by hundreds or thousands of individuals who have been exposed to unsafe conditions while incarcerated at Osborn, and in the Q Buildings in particular.

110.   The injunctive relief sought, including remedying the conditions of confinement, and providing medical monitoring and treatment of those inmates who have been exposed to toxins and unsafe drinking water, is common to all members of the Class.  The medical protocol for each individual exposed to PCBs, or to friable asbestos, or to unsafe drinking water, will be the same for each member of the proposed Subclasses.

\
9472877v1

111.    The question of damages will also be driven by class-wide determinations. To the extent that individual damages will vary, they can be categorized into subgroups based upon whether (a) the Class members have confirmed medical diagnoses of conditions associated with exposure, as set forth above, (b) whether Class members develop any future conditions as a result of said exposure, and (c) whether Class members are determined, through medical examination, to require ongoing medical monitoring based on elevated levels of toxins in their systems.  Determining damages for individual Class members can thus be handled in a more ministerial fashion based upon easily verifiable medical records.  If necessary, individual Class members may request separate hearings to determine specific damages after Class-wide liability is determined, a method of determining damages that is far more efficient than litigation of hundreds of separate lawsuits.

## COUNT ONE

### Unconstitutional Conditions of Confinement at Osborn
### in Violation of Eighth Amendment of the United States Constitution

112.    Plaintiffs repeat and reallege all of the allegations in Paragraphs 1 through 111 as though fully set forth herein.

113.    As set forth above, inmates at Osborn have been subjected to inhumane and hazardous conditions of confinement in violation of their Eighth Amendment rights under the United States Constitution to be free from cruel and unusual punishment.

114.    As set forth above, PCBs and friable asbestos are well-known human carcinogens which also are known to cause a myriad of other above-referenced medical conditions, including cancer.

\
9472877v1

115.    As set forth above, Plaintiffs were housed in the Q Buildings at Osborn for various periods of time between November 19, 2013 and November 2016, when the Q Buildings were closed permanently.

116.    The records produced by TRC make clear that some or all of the named Defendants were aware, as early as 2011, of the hazardous PCB levels in the Q Buildings.  The presence of friable asbestos may have been known even earlier by some or all of the named Defendants.  Remediation of PCBs did not commence until the decision was made to close the Q Buildings.  Remediation of friable asbestos in the Q Buildings was never addressed; instead, other areas impacted generally with ACBMs containing non-friable asbestos were given priority over inmate cell blocks in the Q Buildings.

117.    Inmates were forced to continuously reside in the Q Buildings for several years after discovery of the toxins until the buildings were finally and permanently closed.  The inference is clear that some or all of the named Defendants, although well aware of the dangerous conditions in the Q Buildings, forced inmates to remain in units that were uninhabitable and posed serious health risks to the inmates.

118.    The named Defendants all knew, or should have known, of these conditions of confinement, and each intentionally chose to do nothing to notify Plaintiffs of the risks to which they were being exposed, to cure these conditions or to remove Plaintiffs to a facility without such conditions.  Each of the Defendants allowed the Plaintiffs to be continuously exposed to excessive levels of deadly toxins, causing risk of serious and irreparable physical harm that may not manifest for years.

\
9472877v1

119.    As set forth above, several of the Plaintiffs have already suffered serious medical conditions while at Osborn, including digestive, respiratory and skin issues, and each of the Plaintiffs shares concerns about the risk of developing serious ailments, including cancer, in the future as a result of the conditions at Osborn.  At least one former inmate, Plaintiff Babulsky, has already tested positive for unsafe elevated levels of PCBs in his bloodstream indicative of PCB poisoning.  On information and believe, other inmates have not been tested to determine baselines for such exposure.

120.    As set forth above, inmates at Osborn have been forced to drink and shower in water that is brown and opaque, that smells and tastes putrid.

121.    As set forth above, inmates at Osborn have complained about the conditions of the water for decades.  Plaintiffs have complained about the condition of the water and about various ailments they believe to be caused by the water, although in most cases, their complaints have gone unacknowledged.

122.    As set forth above, numerous inmates have contracted illnesses, including infection with H. pylori bacteria, painful digestive problems or severe and unexplained skin rashes, which are believed to be caused by the water.

123.    As set forth above, maintenance workers at Osborn employed by the Department of Corrections were aware of, or personally involved in, making illegally drilled holes in sewage pipes exiting the housing units at Osborn that may have allowed raw sewage to seep into the ground water.

124.    Although the Department of Corrections has produced documents showing water test results for Osborn since 2013, many questions regarding the water and potential contaminants in the water remain unanswered.  While the water has been

\
9472877v1

tested for the presence of E. coli and coliform, the records produced do not reflect that the water was tested for H. pylori, even though numerous inmates have been diagnosed with H. pylori bacterial infections.

125.    The records also demonstrate that the water contains elevated levels of arsenic, which hovers just below EPA reportable levels, as well elevated levels of chorine variants which, on information and belief, are the byproduct of the use of disinfecting chemicals in the well water.  Nevertheless, none of the Defendants took steps to determine whether the presence of these contaminants was connected with the skin rashes and other ailments reported by inmates.

126.    Accordingly, this action is brought to end the pattern and practice of deliberate indifference by the named Defendants to the inhumane and hazardous conditions at Osborn, and to provide relief to those inmates who remain at Osborn and to those who were compelled to reside in the Q Buildings.

127.    All of the named Defendants were responsible for overseeing inmates and/or conditions at Osborn.  Their reckless, intentional and willful failure to notify Plaintiffs of the hazards to which they were exposed, to ensure a safe environment and to remove Plaintiffs in a timely manner and/or to correct the unsafe conditions and/or to provide proper medical testing and care to those inmates who complained of conditions associated with such exposure constitutes a deprivation of Plaintiffs' rights under the Eighth Amendment to the United States Constitution.

## COUNT TWO

### Unconstitutional Conditions of Confinement at Osborn
### in Violation of Article I, Sections 8 and 9 of Connecticut Constitution

128.    Plaintiffs repeat and reallege all of the allegations in Paragraphs 1 through 127 as though fully set forth herein.

129.    As set forth above, inmates at Osborn have been subjected to inhumane and hazardous conditions of confinement in violation of their rights under Article I, Sections 8 and 9 of the Constitution of the State of Connecticut, which protects inmates from cruel and unusual punishment.

130.    As set forth above, the named Defendants were aware for years of the hazardous conditions of confinement of the proposed Subclasses, acted with deliberate indifference to the serious medical risks associated with long-term exposure to the above-referenced toxins, and recklessly, intentionally, and willfully failed to notify Plaintiffs of the hazards to which they were exposed, to take any steps to prevent exposure and potential poisoning by toxic substances and/or to remediate the conditions of confinement and/or to provide proper medical testing and care to those inmates who complained of conditions associated with such exposure.

131.    As set forth above, the named Defendants, by and through their conduct or their failure to act, deprived Plaintiffs of their rights under Article I, Sections 8 and 9 of the Connecticut Constitution.

### CLAIMS FOR RELIEF

As a result of the violations of Plaintiffs' constitutional rights, as set forth above, Plaintiffs demand as follows:

\
9472877v1

a.      Written, verifiable notice to all members of the proposed Subclasses, with the costs of such notice borne by the Defendants;

b.      For the named Plaintiffs, and for the members of both proposed Subclasses, a declaratory judgment that the acts and omissions of the Defendants violated their constitutional rights under the Constitution of the United States;

c.      For the members of the Water Subclass, injunctive relief by way of an order that bottled water shall be provided immediately to all inmates of Osborn until such time as the conditions of the water are corrected and proper testing demonstrates that the water is safe for consumption;

d.      For the members of the Water Subclass, injunctive relief by way of an order that immediate steps be taken to determine a plan for remedying the condition of the well water at Osborn on a permanent basis;

e.      For the members of the Water Subclass, injunctive relief by way of immediate medical testing and treatment for those members who have complained of digestive and/or skin conditions to determine whether such conditions have been caused by contaminants in the water, including testing for H. pylori bacteria;

f.      For the named Plaintiffs and members of the proposed Asbestos/PCB Subclass, injunctive relief by way of immediate medical testing to establish a baseline for determining the extent and possible consequences of exposure to friable asbestos and/or PCBs;

g.      For the named Plaintiffs and members of the proposed Asbestos/PCB Subclass, injunctive relief by way of comprehensive medical treatment for any Subclass members determined to be suffering from any medical condition causally connected to

41

exposure to friable asbestos and/or PCBs, the course of treatment to be determined by a medical professional knowledgeable regarding such toxin exposure;

h.      For the named Plaintiffs and members of the proposed Asbestos/PCB Subclass, injunctive relief by way of medical monitoring, including comprehensive physical exams on at least an annual basis, to determine whether any medical conditions have or may arise as a result of exposure to friable asbestos and/or PCBs;

i.      For the named Plaintiffs and members of the proposed Asbestos/PCB Subclass, injunctive relief by way of follow-up medical care and treatment for all diagnosed medical conditions as have been previously identified, or may in the future be identified, as causally linked to exposure to friable asbestos and/or PCBs;

j.      Noneconomic monetary damages payable by the Defendants in their individual capacities to all members of both proposed Subclasses who have already been diagnosed, or who in the future are diagnosed, with medical conditions as have been previously identified, or may in the future be identified, as causally linked to exposure to any of the toxins referenced above;

k.      Compensatory damages against each and every Defendant in his/her individual capacity only, in an amount to be determined at trial, payable to each of the named Plaintiffs for standing in the place of the member Classes for purposes of this litigation;

l.      Reasonable attorneys' fees and costs of suit; and

m.      Any other relief this Court deems just and equitable.

\
9472877v1

Dated:      September 21, 2018        PLAINTIFFS SEAN TOLIVER,
              Stamford, CT                JAMES BABULSKY, JEREMY
LOUIS BARNEY, LUIS CLAUDIO,
ROGER JOHNSON, RANDAL
LICARI, JOHN F. MOORE, JOSE
PESANTE, HAROLD ROGERS,
OSBERT TEEKASINGH,

By:____*/s/ Lorey Rives Leddy*____
David P. Friedman (ct# 03558)
Lorey Rives Leddy (ct# 19297)
MURTHA CULLINA LLP
177 Broad Street, 16th Floor
Stamford, CT 06901
Tel: (203) 653-5400
Fax: (203) 653-5444
dfriedman@murthalaw.com
lleddy@murthalaw.com

## **<u>CERTIFICATE OF SERVICE</u>**

This is to certify that on September 21, 2018, a copy of the foregoing was filed electronically [and served by mail on anyone unable to accept electronic filing].  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system [or by mail to anyone unable to accept electronic filing].  Parties may access this filing through the Court's system.

Carmel A. Motherway, Esq.
Steven A. Barry, Esq.
State of Connecticut
Office of the Attorney General
110 Sherman Street
Hartford, CT 06105

/s/  *Lorey Rives Leddy*
Lorey Rives Leddy

\
9472877v1